# Nos. 23-1555 & 23-1556

# In the United States Court of Appeals
### FOR THE SEVENTH CIRCUIT

CHARLES HESS ET AL.

*Appellees, Cross-Appellants*

V.

BIOMET, INC. AND ZIMMER BIOMET HOLDINGS, INC.,

*Appellants, Cross-Appellees*

On Appeal from the United States District Court for the Northern District of Indiana—South Bend Division (Chief Judge Jon E. DeGuilio) Case No. 3:16-CV-208 JD.

## COMBINED REPLY AND ANSWERING BRIEF OF DEFENDANTS-APPELLANTS-CROSS-APPELLEES BIOMET, INC. AND ZIMMER BIOMET HOLDINGS, INC.

DAVID B. SALMONS
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000

TROY S. BROWN
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA  19103
(215) 963-5000

*Counsel for Defendants-Appellants-Cross-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF JURISDICTION FOR CROSS-APPEAL ................... 1

INTRODUCTION ............................................................................ 1

STATEMENT OF THE ISSUE FOR THE CROSS-APPEAL ................. 4

STATEMENT OF THE CASE FOR THE CROSS APPEAL ................... 4

    I.     Counts II and III of Plaintiffs' Complaint ............................ 4

    II.    The District Court Dismissed Counts II and III. .................. 6

SUMMARY OF ARGUMENT .................................................... 8

STANDARD OF REVIEW FOR THE CROSS-APPEAL ..................... 10

ARGUMENT ............................................................................. 11

    I.     The Distributorship Agreement Is Unambiguous ............... 11

         A.    The Distributorship Agreements Unambiguously Limit Each Plaintiff's Long-Term Commissions to Sales Within the Scope of Their Biomet Distributorships, as They Existed When Their Programs Were Initiated. ............................................ 12

         B.    Plaintiffs Cannot Use Extrinsic Evidence to Manufacture Ambiguity ............................................... 18

    II.    Because the Distributorship Agreements Are Unambiguous, the Judgment Must Be Vacated .................. 23

# TABLE OF CONTENTS

**Page**

A. Biomet's Challenge to the District Court's Ambiguity Ruling Is Properly Before the Court and Warrants Relief. ................................................... 23

B. Under the Proper Interpretation of the Unambiguous Agreements, the Jury's Verdict Is Flawed and Must Be Vacated. ..................................... 28

   1. The Verdict Is Procedurally Flawed. .................. 28

   2. The Verdict Is Inconsistent with the Unambiguous Meaning of the Agreements. ........ 30

      a. Plaintiffs Did Not Sell Sports Products As Part of Their Biomet Distributorships At the Time They Retired. ......................................... 31

      b. Plaintiffs Received Damages on Sales of Trauma Products That Were Not Part of Their Biomet Distributorships. ..... 33

      c. None of the Other Evidence Plaintiffs Cite Salvages the Jury Verdict. ................. 36

III. The Jury's Verdict as to Plaintiff Shera Is Inconsistent With the Evidence at Trial. .................................................. 39

IV. The District Court Properly Dismissed Counts II and III of Plaintiffs' Complaint Because They Failed to State a Claim Upon Which Relief Can Be Granted. ......................... 42

CONCLUSION ...................................................................... 49

CERTIFICATES OF COMPLIANCE .................................................... 50

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF SERVICE...................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ambassador Animal Hosp., Ltd. v. Elanco Animal Health Inc.*,
    74 F.4th 829 (7th Cir. 2023) ............................................................ 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................ 10

*Bancorpsouth, Inc., v. Fed. Ins. Co.*,
    873 F.3d 582 (7th Cir. 2017) ...................................................... 10, 46

*Beam v. Wausau Ins. Co.*,
    765 N.E.2d 524 (Ind. 2002) ............................................................ 22

*BKCAP LLC v. CAPTEC Franchise Tr. 200-1*,
    572 F.3d 353 (7th Cir. 2009) .......................................................... 47

*BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*,
    804 F.3d 1229 (7th Cir. 2015) ........................................................ 24

*Care Grp. Heart Hosp., LLC v. Sawyer*,
    93 N.E.3d 745 (Ind. 2018) ................................................ 18, 28, 46

*Celadon Trucking Servs., Inc. v. Wilmoth*,
    70 N.E.3d 833 (Ind. Ct. App. 2017) ............................................... 19

*Funeral Fin. Sys. v. United States*,
    234 F.3d 1015 (7th Cir. 2000) ........................................................ 47

*Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*,
    167 F.3d 1170 (7th Cir. 1999) ........................................................ 43

*John M. Abbott, LLC v. Lake City Bank*,
    14 N.E.3d 53 (Ind. Ct. App. 2014) ................................................. 20

*Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*,
    55 F.4th 517 (7th Cir. 2022) ...................................................... 10, 44

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kelly v. Smith*,
   611 N.E.2d 118 (Ind. 1993) ................................................................. 14

*Lawson v. Sun Microsystems, Inc.*,
   791 F.3d 754 (7th Cir. 2015) ....................................................... *passim*

*Massey v. Blue Cross-Blue Shield of Ill.*,
   226 F.3d 922 (7th Cir. 2000) ............................................................. 40

*MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.*,
   802 N.E.2d 901 (Ind. 2004) ............................................................... 19

*Oxford Fin. Grp., Ltd. v. Evans*,
   795 N.E.2d 1135,1143 (Ind. Ct. App. 2003) ....................................... 19

*PPM Fin., Inc. v. Norandal USA, Inc.*,
   392 F.3d 889 (7th Cir. 2004) ............................................................. 22

*Reuille v. E.E. Brandenberger Constr., Inc.*,
   888 N.E.2d 770 (Ind. 2008) ............................................................... 21

*Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*,
   72 N.E.3d 908 (Ind. 2017) ................................................. 13, 18, 34, 37

*Univ. of S. Ind. Found. v. Baker*,
   843 N.E.2d 528 (Ind. 2006) ............................................................... 20

*Zimmer US Inc. v. Mire*,
   188 F. Supp. 3d 843 (N.D. Ind. 2016) ................................................ 46

**RULES**

Fed. R. Civ. P. 12(b)(6) ......................................................................... 7

Fed. R. Civ. P. 50 ....................................................................... *passim*

## STATEMENT OF JURISDICTION FOR CROSS-APPEAL

Plaintiffs' Amended Jurisdictional Statement for their cross-appeal is complete and correct. *See* No. 13-1555 Dkt. 27.

## INTRODUCTION

Plaintiffs are grasping at straws in both the appeal and the cross-appeal. As for Biomet's appeal, Plaintiffs place themselves in an untenable position. They have abandoned any claim that their interpretation of the Distributorship Agreements is correct and accepted a jury verdict that they claim is consistent with Biomet's interpretation. They therefore accept that Biomet's interpretation is the correct one and question only whether it is unambiguously so. It is. The plain terms of the Agreements make clear that Plaintiffs' long-term commissions are limited based on both the geographic and product-based limitations on the Biomet distributorships created by the Agreements. Because the Agreements are clear, it was reversible error for the District Court to submit Plaintiffs' interpretation to the jury.

To argue otherwise, Plaintiffs begin by distorting the standard of review. After much throat-clearing, they recognize (as they must) that the main question in this appeal is one of contract interpretation—a pure

question of law for the Court and for which the Court gives no deference to the District Court.  Plaintiffs then present slight textual analysis and instead rely on external evidence that cannot be used to create an ambiguity.  None of Plaintiffs' arguments rebuts Biomet's showing that the plain language of the Agreements precludes any finding of breach in this case.

The District Court's legally erroneous holding that the Agreements were ambiguous requires that the judgment be vacated.  Because the record below precludes any basis for a finding of liability or damages, the Court should reverse and direct judgment in favor of Biomet.  But at a minimum, Biomet is entitled to a new trial based on the correct legal interpretation of the unambiguous terms of the Agreements.

Plaintiffs' only response is that the jury accepted Biomet's interpretation and therefore the issue is "moot."  But the jury did no such thing.  While the jury clearly rejected Plaintiffs' interpretation of the Agreements, it still found liability and awarded damages that are barred by the Agreements' plain terms.  So, in no way is the District Court's error "moot" or otherwise harmless.

Plaintiffs' contrary arguments miss the mark and mischaracterize Biomet's arguments.  Plaintiffs incorrectly assert that Biomet is making a sufficiency of the evidence challenge to the District Court's summary judgment order.   But Biomet is only challenging the court's legal conclusion that the Agreements are ambiguous.  Plaintiffs also wrongly assert that Biomet is making an argument that Plaintiffs label "the subsidiary argument," theorizing that Biomet is arguing that the jury's damages award cannot stand because it would require piercing the corporate veil of Biomet's subsidiaries.   Biomet is making no such argument.  Instead, the record evidence shows that the jury's award was **<u>inconsistent</u>** with the plain terms of the Agreements.   The sports products for which Plaintiffs received damages were sold pursuant to **<u>other</u>** distributorship agreements and therefore were categorically outside the scope of these Agreements.  Additionally, despite Plaintiffs' unsupported assertions to the contrary, the damages based on trauma products **<u>were not</u>** products they sold as part of their Distributorship Agreements, but rather those sold by **<u>separate subsidiaries</u>**, including primarily products acquired via the acquisition of a former competitor, DePuy Trauma.

Plaintiffs' cross-appeal is also meritless. The District Court properly dismissed Counts II and III of the Complaint because they failed to state a claim for relief. Although these counts were ostensibly for breach of the Distributorship Agreements, the District Court correctly held that they lacked any basis in those Agreements. Contrary to Plaintiffs' arguments, the District Court did not engage in any factual analysis to come to this conclusion, but rather focused on Plaintiffs' own allegations in the Complaint. To the extent Count III asserts any claim, it is duplicative of Count I. The District Court should be affirmed on this point.

**STATEMENT OF THE ISSUE FOR THE CROSS-APPEAL**

Whether the District Court properly dismissed Counts II and III of Plaintiffs' complaint—labeled "re-branding" and "merger" claims—because they were insufficiently pled, legally deficient, and otherwise duplicative of Plaintiffs' main breach-of-contract claim.

**STATEMENT OF THE CASE FOR THE CROSS APPEAL**

**I.    Counts II and III of Plaintiffs' Complaint**

Plaintiffs' complaint contained six counts. A182–91. The first three are claims for "breach of contract" and allege that Biomet breached the Distributorship Agreements. *Id.*

4

Count I is labeled an "Underpayment Claim" and seeks damages for Biomet's alleged breach of the Distributorship Agreements by failing "to pay the Legacy Distributors a commission on all Biomet products sold in their respective territories." A183 ¶ 96. Count I is the only count that made it to the jury, and the jury's partial verdict for Plaintiffs on that count is the subject of Biomet's appeal. *See* Defs.' Br.

Count II is termed a "Re-Branding Claim." Count II alleged that Biomet breached the Distributorship Agreements "and the implied covenant of good faith and fair dealing by spinning off, re-branding, substituting and otherwise discontinuing Biomet-branded products, in favor of substantially similar, if not functionally identical, product bearing a Zimmer and/or Zimmer Biomet brand, and by failing to pay the Legacy Distributors a commission on such Zimmer or Zimmer Biomet branded products, as required by the Agreements." A185–86 ¶ 113. Plaintiffs assert that those actions "resulted in the erosion of commission payments made to the Legacy Distributors" and therefore are a "material breach of the Agreements." A186 ¶ 114. For this alleged breach, Plaintiffs "seek damages to compensate them for the reduction in commissions." A186 ¶ 115.

Plaintiffs labeled Count III a "Merger Claim," alleging that the "Distributorship Agreements expressly establish a retirement-income program and provide for payment of a lifetime commission on all Biomet products sold in the relevant territories." A186–87 ¶ 120. Plaintiffs further contend that Biomet "has materially breached the Agreements and the implied covenant of good faith and fair dealing by failing to pay the Legacy Distributors commissions on all products sold by Biomet or Zimmer Biomet in the Legacy Distributors' former territories, regardless of whether such products are branded as Biomet, Zimmer, or Zimmer Biomet products." A187 ¶ 123. They also contend that Biomet "further repudiat[ed]" its "payment obligations to the Legacy Distributors" by stating that "it disavows any obligation to pay the Legacy Distributors commissions on any 'non-Biomet products[.]'" A187 ¶ 124.

## II. The District Court Dismissed Counts II and III.

Biomet moved to dismiss the complaint, including Counts II and III, for failing to state a claim. *See* A1–34. The District Court granted the motion in part and dismissed both Counts II and III. The District Court held that Count II (the "Re-Branding Claim") did not state a valid breach-of-contract claim because "the Complaint does not identify any

contractual obligation that Defendants allegedly breached by" re-branding products on which Plaintiffs were allegedly owed retirement commissions.  A12–13.

As to Count III (the "Merger Claim"), the District Court rejected Plaintiffs' contention that "whether the parties intended for the Agreements to apply to Zimmer and Zimmer Biomet products is a fact-intensive issue that is inappropriate for resolution under a Rule 12(b)(6) motion" because "the Complaint does not allege a contractual obligation for Zimmer Biomet to pay Plaintiffs a commission on any products other than Biomet products."  A14–15.  Therefore, the District Court held that the complaint failed to state a claim as to commissions on any sales of Zimmer products or Zimmer-Biomet products.  A15.  According to the District Court, to the extent Count III stated any claim it was "a breach of contract claim relating to Biomet products" and duplicative of the claim asserted in Count I.

The District Court also rejected Plaintiffs' argument that both Counts II and III stated claims against Biomet for breaching the implied covenant of good faith and fair dealing.  A18.  The District Court determined that the complaint did not contain any allegations that

Biomet "had a superior vantage point when the parties entered into the Agreements" and did not allege any ambiguities as to the scope of the Agreements as relevant to these claims.  A16, 18.

## SUMMARY OF ARGUMENT

As for Biomet's appeal, Plaintiffs do nothing to rebut the conclusion that the terms of the Distributorship Agreements unambiguously foreclose Plaintiffs' claims.  The District Court erred as a matter of law in submitting the interpretation of those Agreements to the jury, and that error requires reversal.  Just because the jury rejected Plaintiffs' interpretation of the Agreements at trial does not render the District Court's error "moot" or otherwise harmless.  The jury, confused by the introduction of extraneous evidence about the meaning of the Agreements, found Biomet liable and awarded damages in direct contradiction of the Agreements' plain terms.  Because there is no evidence to support a violation based on a proper interpretation and application of the Agreements' unambiguous terms, Biomet is entitled to judgment in its favor.  But, at a minimum, it is entitled to have the judgment vacated and remanded for further proceedings consistent with

the correct legal interpretation of the unambiguous terms of the Agreements, including a new trial if necessary.

As for Plaintiffs' cross-appeal, the District Court correctly dismissed Counts II and III of the Complaint for failing to state claims. These claims are both legally deficient and lack plausible allegations. In Count II—the "Re-Branding" claim—Plaintiffs seek to hold Biomet responsible for breach of the Agreements without demonstrating any provision of the Agreements that Biomet's alleged conduct violated. The District Court therefore properly determined that this claim could not proceed.

Similarly, the District Court found that Count III (the "Merger Claim") was insufficiently pled. Although Plaintiffs alleged in that count that Biomet failed to pay them retirement commission on "Zimmer" or "Zimmer Biomet Products," the Plaintiffs themselves alleged that the Agreements only entitled them to commission on sales of Biomet products. Plaintiffs attempt to paint this as an issue of fact that the Court should not have resolved on a motion to dismiss and cite to trial evidence to support their claims. But the District Court's conclusion was properly based on the allegations in the complaint. As the District Court

properly held, those allegations at most amounted to a contention that Zimmer Products and Zimmer-Biomet Products should be considered "Biomet products" under the Agreements. But this claim is duplicative of Count I.

## STANDARD OF REVIEW FOR THE CROSS-APPEAL

The Court reviews the district court's decision on a motion to dismiss *de novo*. *Ambassador Animal Hosp., Ltd. v. Elanco Animal Health Inc.*, 74 F.4th 829, 831 (7th Cir. 2023). To survive a motion to dismiss, a claim must be "plausible on its face." *Bancorpsouth, Inc., v. Fed. Ins. Co.*, 873 F.3d 582, 586 (7th Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court "accept[s] as true all well-pleaded facts in the complaint and draw[s] reasonable inferences in favor of the plaintiff," "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022) (citations omitted).

**ARGUMENT**

## I.    The Distributorship Agreement Is Unambiguous

Plaintiffs concede that whether the Distributorship Agreements are ambiguous is a pure question of law that is properly before this Court. *See* Pls.' Br. 24–25; *see infra* at 23–27.  And by not appealing the jury's verdict recognizing product-based limitations on long-term commissions payable under the Distributorship Agreements, Plaintiffs abandon the argument that their interpretation of the Distributorship Agreements is correct.  It is thus undisputed that Plaintiffs' interpretation of the Distributorship Agreements is wrong.  The only question is whether the meaning of the Agreements is sufficiently plain in Biomet's favor that it was error for the District Court to submit Plaintiffs' interpretation to the jury in the first place.

Plaintiffs offer an array of arguments to suggest that their incorrect interpretation of the Distributorship Agreements was at least reasonable.  Some of those arguments mischaracterize the Distributorship Agreements; others are inconsistent with Indiana law because they impermissibly attempt to use extrinsic evidence to prove

11

ambiguity. None suffices to show that the Distributorship Agreements are ambiguous.

### A. The Distributorship Agreements Unambiguously Limit Each Plaintiff's Long-Term Commissions to Sales Within the Scope of Their Biomet Distributorships, as They Existed When Their Programs Were Initiated.

In its opening brief, Biomet explained in detail why the text of the Distributorship Agreements unambiguously limits each Plaintiff's long-term commissions to sales within the scope of their Biomet distributorships, as they existed when their Programs were initiated. *See* Defs.' Br. 28–40. Plaintiffs do not even attempt to rebut much of Biomet's argument. *See, e.g.*, *id.* at 33–35 (describing how the temporal limitation on the definition of "net sales" confirms the Agreements are unambiguous); *id.* at 35–37 (describing how the Agreements unambiguously distinguish between "distributorships" and "territory[ies]"). Plaintiffs' limited attempts to rebut Biomet's argument fail.

Plaintiffs argue that Sections 9(d) and 9(e) of the Agreements are ambiguous because they "contain no **express** product-based limitations." Pls.' Br. 30 (emphasis added). But references in those Sections to "the distributorship" (A243) or "the subject distributorship" (A245) plainly

refer to the distributorship created by each "Distributorship Agreement" with Biomet. *See* Defs.' Br. 28–40. Each such distributorship unquestionably had product-based limitations. *See* A57. The only reasonable interpretation of the Sections 9(d) and 9(e) of each Agreement, then, is that they refer to the "distributorship" created by each Agreement—with both product-based and territorial limitations.

Plaintiffs suggest that understanding the "distributorship" referenced in Sections 9(d) and 9(e) to refer to the distributorship created by each "Distributorship Agreement" serves to "highlight the ambiguity of the contracts by conflating two distinct provisions." Pls.' Br. 31. According to Plaintiffs, the Distributorship Agreements describe two different distributorships—an "active distributorship (*e.g.*, §§ 2–6)" with product-based limitations, and a different (undefined) "subject distributorship" with no product-based limitations for "the payment of commissions during Plaintiffs' retirements (§ 9)." *Id.* That is clearly an unreasonable reading of the Agreements. Indiana law requires that the Distributorship Agreements be interpreted as a whole. *See, e.g., Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017) ("We look at the contract as a whole to determine if a party is charged

with a duty of care and we accept an interpretation of the contract that harmonizes all its provisions."); *Kelly v. Smith*, 611 N.E.2d 118, 121 (Ind. 1993) ("The court, in interpreting the agreement, is under an obligation to read the agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent."). Viewing each Distributorship Agreement as a whole, the only reasonable interpretation is that each Agreement creates a single "distributorship" with product-based limitations and that each Agreement's references to the "distributorship" is a reference to the "distributorship" created by that Agreement, including its product-based limitations. That Biomet's interpretation of the plain language harmonizes the meaning of "distributorship" throughout the Agreements in an utterly sensible way is hardly a strike against it, much less a basis for finding an ambiguity.

Because the Plaintiffs cannot advance a reasonable interpretation based on the text of Sections 9(d) and 9(e) or the Distributorship Agreements more generally, they attempt to manufacture ambiguity by mischaracterizing the Distributorship Agreements. Biomet explained in its Opening Brief that Section 9(d) states that long-term commissions for "the distributorship" would be calculated as a percentage of "net sales,"

14

which are defined in Section 9(e) as "gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet less returns and allowances and less **adjustments for nonpayment of invoices as provided herein**."   Defs.' Br. 31 (quoting A245).   The reference to "adjustments for nonpayments of invoices **as provided herein**" confirms that the "subject distributorship" refers to the very distributorship created by and discussed throughout each Distributorship Agreement, because the only "adjustments for nonpayment of invoices" provided for in each Agreement appear in Section 2(e) and pertain to the distributorship created by that Agreement.   *See* Defs.' Br. 31–32 ("Thus, the only reasonable interpretation of Section 9(e) is that the distributorship created by the Agreement—and featuring both product-based and territorial limitations—is the same distributorship discussed in Section 9(e), not any other distributorships that might one day be created.").   Plaintiffs respond by claiming that the phrase "adjustment for non-payment of invoices" must refer to "the inevitable adjustment for sales that are never completed"—but by doing so, Plaintiffs simply ignore the words "as provided herein."   Pls.' Br. 31.   That is impermissible.   When those three

words ("as provided herein") are considered—as they must be, under Indiana law—there can be no dispute that Section 9(e) is expressly referring to particular adjustments provided for elsewhere in each Distributorship Agreement and only in connection with the distributorship created by each Agreement. This confirms, again, that the "subject distributorship" must refer to the distributorship created by each Agreement, which unquestionably included product-based limitations.

The District Court acknowledged at summary judgment that each distributorship created by each Distributorship Agreement was defined both by geographical limitations and "by their products." A57. It also rejected Plaintiffs' arguments that the preposition "within" was supposedly inconsistent with product-based limitations (A58), that the definition of "net sales" needed to be "harmonized" with the scope of the non-compete in Section 9(h)(1) (A59), and that "net sales" defined by reference to the distributorships created by the Agreements could not result in long-term commissions on sales of products outside the scope of those distributorships (A63). *See* Defs.' Br. 37–40. Plaintiffs downplay these analyses by referring to the District Court's ultimate conclusion

that the Agreements are ambiguous, Pls.' Br. 40, but that only underscores the District Court's error. The District Court's **conclusion** that the Agreements are ambiguous is fundamentally inconsistent with the District Court's **reasoning** showing why Plaintiffs' interpretation is not just wrong but also unreasonable.

In an attempt to confuse the issues, Plaintiffs mischaracterize Biomet's argument concerning the significance of the defined term "Biomet" in each Distributorship Agreement. *See* Pls.' Br. 30–32. Plaintiffs suggest that Biomet cites the defined term "Biomet" to claim that long-term commissions are not payable on sales by Biomet subsidiaries. *Id.* But that is not Biomet's position. Biomet's brief explains that Section 9(e)'s reference to "Biomet"—a defined term referring to Biomet, Inc.—"underscore[s] that the program is limited to the Biomet distributorships created by the Agreements, not separate distributorship agreements with other legal entities or just the geographical territories of the Biomet distributorships without regard for the product limitations of the Biomet distributorships." Defs.' Br. 32–33. The term "Biomet" thus reinforces that the "subject distributorship" referenced in Section 9(e) is the Biomet distributorship created by the

17

Distributorship Agreement.  It would be unreasonable to interpret a reference to the "subject distributorship" in the same sentence as a reference to "Biomet" as referring to potential future sales **_of non-_** **_Biomet products_**, as Plaintiffs urge.

### B.     Plaintiffs Cannot Use Extrinsic Evidence to Manufacture Ambiguity.

Under Indiana law, contract interpretation begins with "the contract language to determine whether it is ambiguous."  *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018).  Plaintiffs do not dispute that "[if] the language of the contract is unambiguous, the intent of the parties is determined from the four corners of the contract, with contractual language being given its plain and ordinary meaning in view of the whole contract."  Defs.' Br. 29 (citing *Ryan*, 72 N.E.3d at 917, and *Care Grp. Heart Hosp., LLC*, 93 N.E.3d at 752).  Nonetheless, Plaintiffs invite the Court to rely on three matters **outside** the Distributorship Agreements when deciding whether those Agreements are ambiguous.  Because doing so would contravene blackletter Indiana law, the Court should decline the invitation.

First, Plaintiffs suggest that the Distributorship Agreements are ambiguous because Biomet drafted them "when it was a start-up

desperate to attract top-tier distributors like Plaintiffs." Pls.' Br. 30. But under Indiana law, who drafted the Agreements and why is only relevant to the question of how to interpret an otherwise ambiguous contract. *See MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004) ("**When there is ambiguity in a contract**, it is construed against its drafter." (emphasis added)); *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017); *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135,1143 (Ind. Ct. App. 2003). Those facts are irrelevant to determining whether the contract is ambiguous in the first place. *See, e.g.*, *MPACT Const. Grp., LLC*, 802 N.E.2d at 910 ("Courts are required to give effect to parties' contracts and to do so, courts look to the words of a contract."); *Celadon Trucking Servs., Inc.*, 70 N.E.3d at 839 ("If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument.").

Second, Plaintiffs attempt to manufacture ambiguity based on mischaracterized statements from Biomet and its witnesses regarding the scope of the long-term commission program. *See* Pls.' Br. 32–37.

Though Plaintiffs devote five pages of their brief to this argument—including lengthy quotations from the trial and discovery records—Plaintiffs do not cite a single case suggesting that Indiana law permits consideration of such extrinsic matters when determining whether a contract is ambiguous.  That is because there are no such cases; Indiana law precludes the use of extrinsic evidence to prove ambiguity.  *See John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014) ("Extrinsic evidence cannot be used to create an ambiguity.") (citation omitted).  Plaintiffs contend that the jury could have disbelieved the statements as reflecting "a post-hoc rationalization of Biomet's breach." Pls.' Br. 37, 62.  But this appeal presents the threshold question of ambiguity, and the Court must determine ambiguity based on the "four corners" of the Agreements.  *See Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006) ("Indiana follows 'the four corners rule' that extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction.")[1] (citation omitted).

---

[1] In any event, nothing in Biomet's statements suggests that Plaintiffs' unquestionably incorrect interpretation of the Distributorship

Third, Plaintiffs rely on other trial testimony to argue that the Distributorship Agreements are ambiguous. *See* Pls.' Br. 40–43. Just as with the Biomet testimony argument, relying on this extrinsic evidence is improper and the Court should disregard it. Indeed, Plaintiffs themselves cite to a decision from the Indiana Supreme Court acknowledging that what matters in contract interpretation is "the parties' intent **as reasonably manifested by the language of the agreement**." Pls.' Br. 40 (emphasis added) (citing *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)). Plaintiffs cannot attempt to prove ambiguity based on trial testimony or other extrinsic facts outside the language of the Agreements.

Even if the Court were to consider the testimony, it hardly proves an ambiguity. Plaintiffs cite their own self-serving testimony about their unexpressed intentions in entering the Agreements but, as Plaintiffs concede, "courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck." Pls.' Br. 40–41

---

Agreements—i.e., that the "subject distributorship" refers only to the geographic territory of the distributorship—is reasonable. Each statement is consistent with the plain and unambiguous meaning of the Agreements that the "subject distributorship" reflects both geographic and product-based limitations.

(quoting *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 893 (7th Cir. 2004)).  Plaintiffs next cite testimony from a Biomet witness that the Agreements could have been written more clearly.[2]  *See* Pls.' Br. 41–42. But that is the case in every contract dispute and has no bearing on the question of ambiguity.  *See Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002) ("[A]n ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party." (citation omitted). Finally, Plaintiffs cite trial testimony from another Biomet witness that extrinsic evidence could be considered in understanding the Agreement. Pls.' Br. 42.  But a lay witness's conjecture about what could be considered to determine ambiguity is insufficient to override clear contractual language or to change blackletter Indiana law.  Moreover, Plaintiffs' reliance on that statement ignores the context of the testimony: the District Court had already determined (in error) that the

---

[2] Plaintiffs' footnoted argument (at Pls.' Br. 41–42 n.7) suggesting something nefarious about "SBU4" is a red herring.  Biomet's position is that certain types of products—including those on which long-term commissions were payable—were assigned to a particular group ("SBU 04") for accounting purposes.  Plaintiffs' suggestion that Biomet chose to pay long-term commissions "based upon whether products were assigned to 'SBU4'" as a means of underpaying Plaintiffs is totally unsupported.

Agreements were ambiguous, and so the trial necessarily involved the presentation of extrinsic evidence to resolve a supposed ambiguity. Again, the testimony does not suggest ambiguity in the slightest.

## II. Because the Distributorship Agreements Are Unambiguous, the Judgment Must Be Vacated.

Because the Distributorship Agreements are unambiguous, it was reversible error for the District Court to submit their interpretation to the jury. Plaintiffs suggest that even if Biomet is correct that the Agreements are unambiguous, it is entitled to no relief from this Court for two reasons: (1) Biomet's requested relief is somehow not properly before the Court, either because it is procedurally improper or waived, Pls.' Br. 44, 48; and (2) any request for relief is somehow "moot" because the jury's verdict is fully consistent with Biomet's interpretation of the Agreements, Pls.' Br. 25. Plaintiffs are wrong on both counts.

### A. Biomet's Challenge to the District Court's Ambiguity Ruling Is Properly Before the Court and Warrants Relief.

Biomet's appeal is fundamentally about the District Court's legal error in holding that the Distributorship Agreements are ambiguous. It presents a "pure question of law" that this Court reviews without deference to the District Court. *See Lawson v. Sun Microsystems, Inc.*,

791 F.3d 754, 761 (7th Cir. 2015); *see also BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 804 F.3d 1229, 1233 (7th Cir. 2015) (vacating a judgment after a bench trial where the district court committed legal error concerning the scope of a contract).  Plaintiffs concede that Biomet's appeal of the ambiguity determination is "properly before the court."  Pls.' Br. 25; *see id.* at 44 n.8.

Standing alone, the District Court's legal error entitles Biomet to relief from the judgment on appeal.  This Court granted relief under similar circumstances in *Lawson v. Sun Microsystems, Inc.*  That case, like this one, involved a breach-of-contract action that was tried before a jury and resulted in a finding of liability against the defendants.  791 F.3d at 762.  On appeal, the defendants argued that the verdict was inconsistent with the plain terms of the contract, even though they had not made that argument in their Rule 50 motion for judgment as a matter of law.  *Id.*  The Court agreed.  It then vacated the judgment and remanded, instructing the district court to enter judgment for the defendants, because the record was clear that the jury could not have reached any other verdict under the plain terms of the contract.  *Id.* at 764.

Just as the defendants were entitled to relief in *Lawson*, Biomet is entitled to relief here, including vacatur of the final judgment and judgment as a matter of law. Plaintiffs do not even attempt to distinguish *Lawson* or demonstrate why the Court should not grant similar relief here.

Instead, Plaintiffs distort Biomet's arguments in two respects in an attempt to suggest that they are not properly before the Court.

First, Plaintiffs incorrectly state that Biomet's appeal "is an appeal, from a denial of summary judgment, based on a sufficiency-of-the-evidence challenge." Pls.' Br. 44. Indeed, the standard of review section of Plaintiffs' brief discusses at length irrelevant standards for Rule 50 challenges for the sufficiency of the trial evidence. Pls.' Br. 25–26. But Biomet is not bringing a general sufficiency-of-the-evidence challenge.[3] Its challenge is simply to the District Court's foundational error in failing to interpret the contracts according to their plain terms. Put another way, Biomet is appealing the District Court's erroneous legal determination that the Agreements are ambiguous, a question which

---

[3] Biomet is bringing a sufficiency of the evidence challenge as to the jury's verdict for Plaintiff Shera. This challenge was properly preserved and is before the Court.

even Plaintiffs recognize is properly before the court.  *See id.* at 25, 44 n.8.[4]

Second, Plaintiffs assert that Biomet is making the same "subsidiary" argument on appeal that it made in its Rule 50 motion.  *See* Pls.' Br. 49.  Not so.  Biomet argues on appeal that the District Court erred in concluding that the Distributorship Agreements are ambiguous. It is not raising the argument that forcing Biomet Inc. to pay long-term commissions on product sales collected by Biomet's subsidiaries constitutes inappropriate veil-piercing.  *See* ECF 381 at 12 ("The facts in evidence do not support that the Subsidiaries were alter egos of Biomet, nor do the facts support piercing the corporate veil.").  That argument is

---

[4] To the extent Biomet's opening brief discussed the state of the record at summary judgment, it was simply to show that had the District Court not erred in its ambiguity determination, it would have granted summary judgment to Biomet.  Plaintiffs cite to portions of their brief at summary judgment that they assert presented factual disputes that would have prevented summary judgment because they sold trauma and sports products.  Pls.' Br. 45.  These citations are unavailing because they simply point to testimony that Plaintiffs sold particular types of products—trauma and sports products—not that Plaintiffs sold those products as part of their Biomet distributorship at the time they retired. *See* ECF 183 at 6 (noting only that "Plaintiffs sold trauma products" and that "**Biomet** continued to sell trauma products throughout the 1990s and into the early 2000s") (emphasis added); *id.* at 7 (noting only that Plaintiffs "sold sports medicine products").

what the District Court concluded had been raised "late in the game." *See* A92 ("Biomet argues that the issue of corporate veil piercing has been in controversy in this litigation, at the very least, since the Court's March 29, 2019 summary judgment order."). Biomet's argument therefore is not waived for the simple reason that it is a different argument than the one Plaintiffs claim it is making.[5]

Properly understood, Biomet's appeal is not waived or otherwise procedurally improper. As Plaintiffs acknowledge, it is "properly before the Court." Pls.' Br. 25; *see id.* at 44 n.8. Accordingly, this Court should follow *Lawson* and grant Biomet appropriate relief from the judgment based on the District Court's legal error by vacating the judgment for Plaintiffs and entering judgment as a matter of law for Biomet.

---

[5] Even if Biomet were making that argument, Plaintiffs are wrong to suggest that the District Court found that waiver was an "independent ground" on which the District Court's Rule 50 opinion rests. Pls.' Br. 51. The District Court found that Biomet failed to timely request a jury instruction on corporate separateness and did not object to other jury instructions on the grounds that they did not explicitly preserve corporate separateness. A93–94. But the District Court nevertheless considered Biomet's arguments and never held that waiver was an independent ground for its decision. *See* A96.

**B.    Under the Proper Interpretation of the Unambiguous Agreements, the Jury's Verdict Is Flawed and Must Be Vacated.**

Plaintiffs contend that this Court need not reach the question of whether the District Court committed legal error in finding the Agreements ambiguous.  Specifically, they assert that because "the jury returned a verdict consistent with Biomet's interpretation" of the Agreements, Pls.' Br. 1–2, Biomet's appeal of the contractual ambiguity issue is "moot," *id.* at 25.  That is wrong.  The verdict must be vacated because it is both procedurally and substantively flawed.   It is procedurally untenable because the District Court's error placed issues before the jury that should not have been.  And it is substantively flawed because the jury's verdict conflicts with the plain terms of the Agreements.

**1.    The Verdict Is Procedurally Flawed.**

The District Court's error tainted the entire trial.  It resulted in the jury being asked to interpret the Agreements and being presented with extrinsic evidence about its meaning.  This is contrary to Indiana law and independently requires reversal.  *See Care Grp. Heart Hosp., LLC*, 93 N.E.3d at 753.

At trial, the jury heard extrinsic evidence, including copious testimony from Plaintiffs about what they supposedly believed the scope of the Agreements to be, including on topics for which the jury eventually awarded damages.  *See e.g.*, A509, 552, 612 (Tr. II 67:2–15; 110: 8–20; 170:11–17).  But because the Agreements are unambiguous, this evidence should have "simply drop[ped] out of the case."  *Lawson*, 791 F.3d at 764; *see id.* at 762 ("The district court . . . denied summary judgment[] and allowed Lawson to present extrinsic evidence at trial bearing on Sun's intent that the plan continue beyond the termination date.  That was a mistake.").

Additionally, the jury was instructed to consider evidence within product categories without regard to whether Plaintiffs sold those products as part of their Biomet distributorship or sold those products at all.  *See* ECF 386 at 26 ("[Y]ou can consider all of the evidence, including the language of that provision, the language of the contracts as a whole, as well as statements or conduct by the parties reflecting their intent or their understanding of the provision's meaning.").  Plaintiffs fault Biomet for failing to object to this instruction and the introduction of extrinsic evidence, such as Plaintiffs' sales of sports products for Arthrotek, *see*

Pls.' Br. 53, 57–58. But such an objection would have been futile because this evidence was only admissible because of the District Court's flawed view that the jury should be allowed to consider extrinsic evidence and decide the Agreement's meaning. Because that was clear legal error resulting in the improper admission of extrinsic evidence and incorrect jury instructions, the verdict must be vacated.

### 2. The Verdict Is Inconsistent with the Unambiguous Meaning of the Agreements.

The jury also reached a verdict that is inconsistent with the unambiguous meaning of the Agreements. Though the jury clearly rejected Plaintiffs' interpretation, it still found liability and awarded damages that are inconsistent with the plain terms of the Agreements. Under the plain meaning of the Agreements, though, Plaintiffs were not entitled to commissions on any of the categories of products for which the jury found Biomet liable. None of the evidence Plaintiffs cite in their brief can sustain the verdict under a proper interpretation of the Agreements. The only verdict consistent with the terms of the Agreements is a verdict finding that Biomet did not breach the Agreements.

    a.    **Plaintiffs Did Not Sell Sports Products As Part of Their Biomet Distributorships At the Time They Retired.**

The jury found Biomet liable for not paying Plaintiffs (excepting Shera) retirement commission on sports products, but those commissions were not owed under the plain terms of the Agreements.

Under the Agreements, Plaintiffs are only entitled to retirement commissions on products that they sold at the time they retired **pursuant to those Biomet distributorships**.  *See supra* at 12.  As shown above, this categorically does not include any products that Plaintiffs sold as part of **other** distributorship agreements.  In the case of the sports products, at the time Plaintiffs retired, they sold those products as part of distributorship agreements **with Arthrotek**.  *See, e.g.* A505, A655, A1036 (Tr. II 63:15–19; Tr. II 213:5–7; Tr. IV 98:7–9).  Those Arthrotek agreements expressly noted that they were separate from and not subject to the terms of the Plaintiffs' Distributorship Agreements **with Biomet**.  A774 (Tr. III 68:3); A292.

Plaintiffs do not meaningfully contend with this argument on appeal.  They ignore the plain import of both the Agreements and the Plaintiffs' separate agreements with Arthrotek.  Indeed, Plaintiffs do not

even mention those Arthrotek agreements or explain why, under a proper interpretation of the Distributorship Agreements with Biomet, products sold pursuant to those other distributorships would generate long-term commissions.

Plaintiffs respond that Biomet "made the same arguments to the jury" on this point.  Pls.' Br. 57.  But this was not a question for the jury to decide.  The sports products that Plaintiffs sold through a separate distributorship agreement are, as a matter of law, outside the scope of the long-term commission program.

Plaintiffs also attempt to suggest, without support, that they sold some sports products that were not sold by Arthrotek.  *Id.*  But Plaintiffs cite to no evidence, and there is none, that they sold sports products pursuant to their Biomet distributorships at the time they retired.  The evidence instead undisputedly shows that Plaintiffs sold sports products based on agreements with Arthrotek and that Arthrotek is the sole predecessor of the subsidiary currently known as Biomet Sports Medicine.  *See* A654–55 (Tr. II 212:23–213:1) ("Q. Did you sell Biomet Sports Medicine products that weren't Arthrotek products?  A. I'm trying to think if there was anything outside the Arthrotek-- I don't think so.");

523 (Tr. II 81:13–25).  Plaintiffs even conflate selling sports medicine products with selling products from Arthrotek.  For example, to argue that  Plaintiff Higgins sold sports products, their sole citation is to testimony concerning Arthrotek products that does not mention sports medicine at all.  *See* Pls.' Br. 11 (citing A1205-07 (Tr. V at 38:15-40:7)).[6]

> **b.  Plaintiffs Received Damages on Sales of Trauma Products That Were Not Part of Their Biomet Distributorships.**

The jury's verdict was also inconsistent with the correct interpretation of the Agreements as to trauma products.  Under the plain terms of the Agreements, Plaintiffs were not entitled to long-term commissions on products that they did not sell at the time they retired from their Biomet distributorships.  *See supra* at 12.  Yet the jury awarded damages to Plaintiffs on products they admittedly **did not sell** and **could not have sold** because they were the result of Biomet's acquisition of DePuy Trauma in 2012.  A515 (Tr. II 73:20–24) ("Q. Let's be clear. Every single one of those companies was acquired after you retired.  So you could not have sold their products, right?  A. Well, we

---

[6] Even if there were a genuine factual dispute on this point, which there is not, at most it would entitle Plaintiffs on remand to argue that they sold non-Arthrotek sports products.

didn't sell their products. If it was like internal fixation, it was the same kind of products."). At a minimum, any of the damages the jury awarded on the DePuy products could not have been awarded under the plain terms of the Agreements.

Plaintiffs assert that the DePuy products were the "natural evolution" of trauma products that Plaintiffs sold prior to the acquisition of DePuy, and therefore that they should receive long-term commissions on their sales. Pls.' Br. 56. As an initial matter, this "natural evolution" test appears nowhere in the Agreements. Plaintiffs cite to Hann's testimony as support, *id.* at 56 n.11, but, under Indiana law, it is the job of the court to interpret the Agreements according to their text. *See Ryan*, 72 N.E.3d at 917. Moreover, the DePuy products were different in kind than anything Plaintiffs were selling as part of their Biomet distributorships at the time they retired. The acquisition—well after Plaintiffs' retirement—resulted in "numerous" significant trauma products that had never been part of the Biomet portfolio. *See* A809–12 (Tr. 103:17–106:1).[7]

---

[7] Plaintiffs fault Biomet for citing to Hann's testimony concerning the development of Biomet's trauma line, Pls.' Br. 54, but his was the only testimony that described this history at all.

Plaintiffs also try to argue that Biomet failed to pay them retirement commissions on sales of trauma products that they contend they sold and that were not a part of the DePuy acquisition. Pls.' Br. 13–14. But Plaintiffs' cited support is unavailing, as it is comprised exclusively of general statements that they sold trauma products, A1084 (Tr. IV at 146:5–22); A1186–87 (Tr. V at 19:16–20:5), discussion of products that Biomet sold in the 1980s (well before Plaintiffs' retirement), A382–92 (Tr. I at 81:23–85:14), and discussion of products that Plaintiffs **admit that they did not sell**. A388 (Tr. I 87:8–11). None of this suggests that Biomet did not pay Plaintiffs on the few trauma products they sold at the time of their retirement.[8]

In sum, the jury unquestionably found Biomet in breach of the Agreements based on its supposed failure to pay long-term commissions

---

[8] Plaintiffs also point to damages calculations for trauma products for sales dating from 2003, prior to the DePuy acquisition in 2012, to suggest that Biomet must have underpaid them commissions based on trauma products they sold. Pls.' Br. 14. But Plaintiffs presented **no evidence** that they sold any of these products. Nor could they. By 2003, any of Biomet's small trauma line was being sold by EBI, an entity whose products Plaintiffs were not allowed to sell as part of their distributorships. A807–08 (Tr. III 101:22-102:19); A763 (Tr. III 57:20–22). Therefore, sales of any of these products would also be outside the scope of the Agreements, under their plain terms.

on sales for which Plaintiffs would not be entitled to long-term commissions under the plain terms of the Agreements. Therefore, the judgment must be vacated. But the evidence also shows that under the proper interpretation of the Agreements, no jury could have awarded Plaintiffs damages for trauma products, so Biomet is entitled to judgment as a matter of law. *See Lawson*, 791 F.3d at 764.

### c. None of the Other Evidence Plaintiffs Cite Salvages the Jury Verdict.

Plaintiffs contend that multiple other pieces of evidence support their position because they "contradict[] Biomet's subsidiary argument." Pls.' Br. 59. But as already explained, Biomet is not making the "subsidiary" argument about veil-piercing, as Plaintiffs contend. Rather, Biomet's argument is that the verdict cannot be supported under a proper interpretation of the Agreements. Because Plaintiffs miss this fundamental point, most of their arguments discussing this evidence are irrelevant.

Turning to the first piece of evidence—Biomet's amended interrogatory responses—Plaintiffs miss the point. To the extent the jury was using those responses in order to decide the scope of the long-term commission program in the Agreements, this was a job for the District

Court to do looking at the plain text of the Agreements. *Ryan*, 72 N.E.3d at 917. Therefore, absent the District Court's error in concluding that the Agreements were ambiguous, the jury never would have considered these responses. Moreover, Biomet's answers were consistent with its view that Plaintiffs would be entitled to long-term commissions on sales of the products they actually sold as part of their Biomet distributorships at the time they retired. Biomet supplemented the responses to reflect precisely what categories of products Plaintiffs' long-term commissions fell into. *See* A818 (Tr. III 112:1–5).

Second, Plaintiffs rely on testimony by Hann to support the view that Plaintiffs were owed long-term commissions on the sales of certain products, irrespective of whether they were sold by Biomet or a Biomet subsidiary. Pls.' Br. 60. Plaintiffs are once again attacking an argument that Biomet is not making. The question is not about subsidiaries *per se*, but about how the Distributorship Agreements define the Biomet distributorship. Thus, where products were sold pursuant to a separate distributorship agreement with a separate corporate entity, those sales are outside the Biomet distributorship defined in the Agreements at issue. In all events, because the Agreements are unambiguous, any

testimony from Hann about what he thought the contract means is irrelevant.[9]  At bottom, this is just another example of how the District Court's fundamental flaw in finding the Agreements to be ambiguous and allowing the use of external evidence has prejudiced Biomet.[10]

Finally, Plaintiffs point to Biomet's course of dealing as to two subsidiaries—OEC and Biomet Orthopedics LLC— on whose products Biomet pays Plaintiffs retirement commissions, and argue that this undermines Biomet's proffered interpretation of the Agreements.  Pls.' Br. 61.  But Plaintiffs ignore the fundamental distinction that Biomet showed about those subsidiaries.  Unlike Arthrotek or Biomet Trauma, Plaintiffs actually distributed the products sold by OEC and Biomet Orthopedics LLC **as part of their Biomet distributorships**.  Their products became part of the "standard Biomet product line" under Section 2 of the Agreements.  A999, A1032–33 (Tr. IV 61:7–21; 94:24–

---

[9] Even then, Hann's testimony is fully consistent with the correct interpretation of the Agreements.  *See* Defs.' Br. 50–51.

[10] Plaintiffs suggest that Biomet's discussion of this other testimony was "waived" in the District Court.  Pls.' Br. 60–61.  Incorrect.  The issue concerning Hann's testimony on this point was explicitly before the District Court.  *See* ECF 381 at 6.  To the extent that Biomet has added any further factual support, it is free to do so.  *See Lawson*, 791 F.3d at 761 (on appeal, a party is allowed to engage in an "amplification of a properly preserved issue").

95:3).  Unlike with the sports products Plaintiffs sold for Arthrotek, there is no evidence that Plaintiffs were required to sign separate distributorship agreements with these subsidiaries in order to sell their products.  *See id.*  As such, Biomet's payment of long-term commissions on sales of products from these subsidiaries is consistent with the plain terms of the Agreements, while paying commissions on the Arthrotek sports products is not.

## III.  The Jury's Verdict as to Plaintiff Shera Is Inconsistent With the Evidence at Trial.

The District Court understood the jury's verdict as requiring Biomet to pay long-term commissions to Plaintiffs based on sales of any products that they sold for any Biomet-related entity at any point during their active distributorships.  A95.  Even under that view of the verdict, which is contrary to the plain terms of the Agreements, *see supra* at 12, the verdict is unsupported as to Plaintiff Shera.

In a settlement agreement, memorialized in part in a court order, Shera "admit[ed] that the Distributorship Agreement does not contractually grant [him] the right to sell the products of Biomet's present subsidiaries or companies which Biomet may acquire in the future."  ECF 175-20 at 1.  By extension, Shera was not entitled to long-

term commissions on products sold by "Biomet's present subsidiaries [at that time] or companies which Biomet may acquire in the future." The jury already awarded Shera a split verdict, by not giving him damages for long-term commissions on sports products. *See* A83. Nevertheless, the undisputed evidence at trial was that the trauma products for which Shera received damages were also sold by Biomet subsidiaries and thus outside the scope of the long-term commission program. Plaintiffs' responses in their brief to this argument are each unavailing.

First, contrary to Plaintiffs' assertion, Biomet did not waive this argument. It was presented in Biomet's Rule 50 briefing and addressed by the District Court. *See* A104. It is therefore properly before the Court.

Second, Biomet applied the proper legal standard. Plaintiffs fault Biomet for saying that the verdict for Shera is "against the weight of the evidence," a statement they argue misstates the proper legal standard. But Biomet cited to the relevant sufficiency-of-the-evidence legal standard in its "Standard of Review" section. *See* Defs.' Br. 27 (citing *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000)). More importantly, nothing about Biomet's nomenclature in its section heading affects the substantive correctness of its argument. The

clear judicial admission by Shera that he was not entitled to sell any products sold by Biomet subsidiaries plainly precludes him from receiving retirement commissions on trauma products, even under the District Court's interpretation of the jury's verdict.

Third, Biomet has not "mischaracterize[ed] the Settlement Agreement" as relevant to Plaintiffs' claims. *See* Pls.' Br. 63. As explained above, the scope of Shera's active Biomet distributorship and the products he sold for Biomet entities are directly relevant to his entitlement to long-term commissions. This is true both under what the District Court concluded was the jury's interpretation of the contract and the plain terms of the Agreements. Both look to what the Plaintiffs sold during their active distributorships as the basis of the retirement commissions under the long-term commissions program. *See* A95.

Finally, Plaintiffs are incorrect that other portions of the Settlement Agreement somehow support the jury's verdict. Pls.' Br. 65. Plaintiffs are simply wrong that the definition of "Products" in the Settlement Agreement supports their position. *Id.* at 64. This provision they cite related to Shera's **_future_** distribution of products **_after_** the Settlement Agreement and is not relevant to the long-term commissions

that had been initiated at the time of the Settlement Agreement. That part of the Settlement Agreement has no relevance to Shera's entitlement to long-term commissions, which under the plain terms of the Distributorship Agreements are only based on products sold by Plaintiffs pursuant to their Biomet distributorships at the time they retired. *See supra* at 12.

## IV. The District Court Properly Dismissed Counts II and III of Plaintiffs' Complaint Because They Failed to State a Claim Upon Which Relief Can Be Granted.

On cross-appeal, Plaintiffs claim the District Court erred when it dismissed Counts II and III of the complaint because Biomet should be liable for failure to pay long-term commissions on the two categories of products at issue in those Counts: (1) one-time Biomet products that Plaintiffs contend were improperly "re-branded" (as "Zimmer" or "Zimmer Biomet" products) or "re-shuffled" (to be sold by Zimmer or Zimmer Biomet) (Count II); and (2) products that were never sold by Biomet but were sold by Zimmer and/or Zimmer Biomet, and which Plaintiffs contend are "Biomet products" by virtue of the merger between Biomet and Zimmer (Count III). Pls.' Br. 65–66. Plaintiffs contend that their asserted entitlement to long-term commissions on "Biomet

products" "extend[s] equally" to these two other categories of products. Plaintiffs are wrong, and the District Court correctly dismissed Counts II and III on the pleadings.[11]

Count II fails for the simple reason that Plaintiffs have not identified (and cannot identify) any contractual restriction on "re-branding" or "re-shuffling" products. The Distributorship Agreements do not impose any limitations on Biomet's ability to brand its products or select the entity that sells particular products. As the District Court rightly concluded, "the Complaint does not identify any contractual obligation that [Biomet] allegedly breached" when it allegedly "spun off, re-branded, substituted, and otherwise discontinued Biomet products." A14–15. Plaintiffs did nothing more than parrot that such conduct breached the Distributorship Agreements, Pls.' Br. 66–68, but the District Court properly refused to credit allegations amounting to little

---

[11] Though Counts II and III include allegations about the "implied covenant of good faith and fair dealing," Plaintiffs do not mention it anywhere in their cross-appeal. Accordingly, any claim that Count II and/or Count III state a claim against Biomet for breach of the "implied covenant of good faith and fair dealing" is waived. *See Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999) ("Arguments not raised in an opening brief are waived.").

more than legal conclusions.  *See Kap Holdings, LLC*, 55 F.4th at 523.

Plaintiffs also cite two examples of products that they allege were re-

branded.  Pls.' Br. 66–68.  But without plausible allegations that such

alleged re-branding breached a contractual obligation, those allegations

do not suffice to state a claim.

Count III similarly fails because notwithstanding the merger

between Biomet and Zimmer, the Distributorship Agreements do not

entitle Plaintiffs to long-term commissions on non-Biomet products.  As

explained above, the plain and unambiguous meaning of the

Distributorship Agreements entitles Plaintiffs to long-term commissions

only on products sold pursuant to the Biomet distributorships created by

those Distributorship Agreements.  *See supra* at 12.  The entitlement to

long-term commissions does not extend to any other products, including

Zimmer and Zimmer Biomet products that were sold pursuant to other

distributorship agreements.

The District Court correctly held that the complaint "does not allege

a contractual obligation for Zimmer Biomet to pay Plaintiffs a

commission on any products **other than Biomet products**[.]"  A15

(emphasis added); *see* A14–15 ("The Complaint alleges that the

Distributorship Agreements 'provide a retirement-income program that would pay a lifetime commission on all Biomet products sold in the relevant territory,' and that 'the program would be paid on a percentage of 'net sales" that 'appl[ies] to Biomet's entire product line without limitations of any type.'" (quoting A159–60. ¶¶ 34, 36)); A15 ("The Agreements entitle [Plaintiffs] to be paid a commission based upon the sales of all Biomet products within their former territories." (quoting A160 ¶ 37)).

Contrary to Plaintiffs' argument (at Pls.' Br. 68), their allegations concerning the fact of the merger between Zimmer and Biomet are not sufficient to allege a contractual obligation to pay long-term commissions on products outside the scope of the Plaintiffs' Biomet distributorships. Pointing to the mere fact of the merger does not plausibly allege that "Biomet products" include non-Biomet products, such as "new products developed post-merger." Pls.' Br. 66.

Plaintiffs attempt to use trial testimony to bolster the plausibility of its "re-branding" and "re-shuffling" claims. *See id.* at 68–69. That attempt fails. Under Indiana law, extrinsic evidence—including trial testimony—cannot be used to vary the terms of fully integrated written

contracts like the Distributorship Agreements. *Care Grp. Heart Hosp., LLC*, 93 N.E.3d at 752. Nor does this Court consider trial evidence on an appeal from a motion to dismiss, since such an appeal is confined to the allegations in the complaint. See *Bancorpsouth, Inc.*, 873 F.3d at 586. Even if it could, Plaintiffs overstate the significance of that testimony. Consideration of the "natural evolution" of products on which long-term commissions were payable does not suggest that the Distributorship Agreements prohibit Biomet from "re-branding" or "re-shuffling" products or entitle Plaintiffs to long-term commissions on all non-Biomet products sold in their territories. At most, it would suggest that Plaintiffs may be entitled to long-term commissions on Biomet products notwithstanding any re-branding or re-shuffling, but that claim would have been duplicative of Count I. *See infra*.

Plaintiffs cite two inapposite cases in support of their cross-appeal. In *Zimmer US Inc. v. Mire*, the parties agreed to a noncompetition agreement covering territories that were "assigned" to the plaintiff, but they disputed whether the plaintiff had in fact been "assigned" any territories. 188 F. Supp. 3d 843, 847 (N.D. Ind. 2016). The district court denied the defendant's motion to dismiss because of well-pled allegations

that the plaintiff had been "assigned" territories.  *Id.* at 850–51.  Here, by contrast, there are not well-pled allegations that the Distributorship Agreements restrict Biomet's ability to make branding decisions and otherwise structure its sales operations as it sees fit.  No "assessment of evidence" is necessary; what matters is the plain meaning of the Distributorship Agreements, which does not even arguably prohibit Biomet from engaging in "re-branding" or "re-shuffling."

In *BKCAP LLC v. CAPTEC Franchise Trust 200-1*, a provision in a loan document contemplated that a formula set out elsewhere in the document might generate a positive value, but one party showed that the formula (if applied literally) would always produce a negative number. 572 F.3d 353 (7th Cir. 2009), as amended (August 5, 2009).  Under those unique circumstances, this Court held that the "literal application of the text" would lead to "absurd results" and "thwart the obvious intentions of its drafters," and it therefore decided to depart from "the plain language of the contract" and consider extrinsic evidence.  *Id.* at 360 (quoting *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000)).  Here, Plaintiffs have not identified any such absurdity that would flow from a literal application of the Distributorship Agreements

as written.  Rather, Plaintiffs are seeking to rewrite the Distributorship Agreements after the fact to impose obligations on Biomet's ability to conduct its business in a manner never agreed to in the Agreements themselves.  The District Court rightly rejected that misguided attempt.

At most, Plaintiffs contend that Counts II and III should not have been dismissed because they effectively allege that Defendants failed to pay long-term commissions on "Biomet products."  *See* Pls.' Br. 66 ("Plaintiffs merely sought to hold Biomet liable for its own obligations, alleging that products re-named or re-shuffled are, *in fact*, *Biomet products*.").  But Plaintiffs already allege a failure to pay long-term commissions on Biomet products—in Count I.  *See* A183 ¶ 96 (alleging failure "to pay the Legacy Distributors a commission on all Biomet products sold in their respective territories as required by the terms of the retirement-income program").  To the extent Plaintiffs assert Counts II and III as alternative views of what comprise "all Biomet products," that issue was already properly within the scope of Count I; Counts II and III added nothing, and the District Court was right to dismiss them.  *See* A18 (dismissing Count III as "duplicative of Count I" insofar as it alleges failure to pay long-term commissions on "all Biomet products").

## CONCLUSION

The Court should reverse the District Court's summary judgment and Rule 50 rulings on Plaintiffs' breach of contract claim and remand instructing the District Court to enter judgment for Biomet.  In the alternative, the Court should vacate the verdict and judgment and remand for further proceedings consistent with the correct legal interpretation of the unambiguous terms of the Agreements, including a new trial if necessary.  The Court should affirm the District Court's dismissal of Counts II and III of Plaintiffs' complaint.


Dated August 31, 2023                    Respectfully submitted,

                                         s/  Troy S. Brown
                                         TROY S. BROWN
                                         MORGAN, LEWIS & BOCKIUS LLP
                                         1701 Market St.
                                         Philadelphia, PA 19103
                                         (215) 963-5000

                                         DAVID B. SALMONS
                                         MORGAN, LEWIS & BOCKIUS LLP
                                         1111 Pennsylvania Avenue, N.W.
                                         Washington, DC  20004
                                         (202) 739-3000

          *Counsel for Defendants-Appellants-Cross-Appellees*

## CERTIFICATES OF COMPLIANCE

1.  This brief complies with the type–volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) as modified by Circuit Rule 28.1. This brief contains 9,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as modified by Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14–point Century Schoolbook font.

Dated: August 31, 2023          s/ Troy S. Brown

                                TROY S. BROWN

## CERTIFICATE OF SERVICE

I hereby certify that on, I caused the foregoing to be electronically filed with the Clerk of the U.S. Court of Appeals for the Seventh Circuit by using the Court's appellate CM/ECF system.


Dated: August 31, 2023          s/ Troy S. Brown
                                TROY S. BROWN